UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

--------------------------X

ST. PAUL MERCURY INSURANCE
COMPANY, on its own behalf and
as subrogee of MARS 2112          <u>MEMORANDUM AND ORDER</u>
WOODFIELD CORP.,
                                  Civil Action No.
      Plaintiffs,              CV-04-360 (DGT)

   -against-

PEPSI-COLA BOTTLING COMPANY OF
NEW YORK, INC., and DUANE
READE, INC.,

      Defendants.
--------------------------X

ST. PAUL FIRE AND MARINE          Civil Action No.
INSURANCE COMPANY a/s/o DUANE     CV-04-2556 (DGT)
READE INC. and other
interested insureds under
Policy Number 0144sp1206,

      Plaintiffs,

   -against-

PEPSI-COLA BOTTLING COMPANY OF
NEW YORK, INC.,

      Defendant.
--------------------------X

Trager, J.:

    St. Paul Mercury Insurance Company ("St. Paul Mercury" or

"plaintiff") and its insured, Mars 2112 Woodfield Corp ("Mars

2112"), seek to recover damages caused by a fire originating in a

refrigeration unit owned by Pepsi-Cola Bottling Company of New

York, Inc. ("Pepsi") and located inside the Duane Reade Inc.

("Duane Reade") store located at 1633 Broadway, New York, New

York 10019.  Duane Reade moves for summary judgment, arguing that it is not liable for damages suffered by plaintiff and its insured.  For the following reasons, Duane Reade's motion for summary judgment is granted.

## Background

### (1)

### Factual Background

#### a. Agreement between Pepsi and Duane Reade

On November 5, 1998, Pepsi and Duane Reade entered into an equipment customer agreement, whereby Pepsi provided Duane Reade with a triple-door visi-cooler,[1] model number GDM69, serial number 2161150 ("Pepsi cooler" or "Pepsi machine").  See May 10, 2006 Affidavit of Michael F. Palmeri in Support ("Palmeri Aff. in Support") ¶ 4, Ex. F; Deposition of Michael Merritt ("Merrit Dep.") at 8:12-9:5.  According to Michael Merritt, the Marketing Equipment Manager for Pepsi, this equipment customer agreement dated November 5, 1998 states the entire agreement between Pepsi

---

[1] A triple-door visi-cooler is a refrigeration unit with three glass doors that holds product inside.  In order to get a Pepsi product out of the Pepsi cooler, a customer opens the glass door, takes the product out and pays for the product at the cash register.  Deposition of Shahab Khan ("Khan Dep.") at 11:23-12:7, Merritt Dep. at 27:14-17.  A cooler is different from a vending machine, whereby the customer places money directly into the machine, and then the product releases.  Khan Dep. at 11:18-12:7.

and Duane Reade. <u>See</u> Merrit Dep. at 35:16-22. Under the customer agreement, Pepsi was the owner the cooler, <u>see</u> Merrit Dep. at 35:12-36, and Duane Reade was to "use the equipment properly and as necessary, service the equipment in a timely manner." Pepsi/Duane Reade Customer Agreement, dated November 5, 1998.

Despite the language of the agreement, it appears all service to and maintenance of the coolers was provided exclusively by Pepsi; neither Duane Reade, nor the distributor[2] of Pepsi product would service the machines. <u>See</u> Khan Dep. at 29:7-21, 41:16-23. In fact, Duane Reade was never provided with a manual or written instructions nor given any written or oral safety warnings regarding the maintenance or service of the cooler. <u>See</u> Merritt Dep. at 37:21-38:6, 136:8-13, 143:9-18.

Pepsi, however, did not perform routine or annual maintenance. <u>See</u> Merritt Dep. at 91:23-25, 100:21-101:2. Instead, the coolers would only be serviced after Duane Reade or the Pepsi distributor placed a call, alerting Pepsi that

---

[2] A distributor would come daily to restock Pepsi product and to clean the Pepsi cooler. Khan Dep. at 28:15-29:21. The distributor is a different entity from vendor/defendant Pepsi-Cola Bottling Company of New York, Inc. The distributor owns the territory that the product is delivered to, buys product from Pepsi and sells it to customers, like Duane Reade. Merritt Dep. at 64:23-65:9.

maintenance needed to be performed on a cooler.[3]  See Deposition of Shahab Khan ("Khan Dep.") at 18:16-24, 20:21-21:4, 25:13-26:15, 27:11-28; Merritt Dep. at 32:12-33:10, 91:23-25, 100:9-20; Rivera Dep. at 32:21-25.

## b. Installation of the Pepsi cooler

Pepsi delivered the Pepsi cooler to Duane Reade's 1633 Broadway store location on November 5, 1998,[4] the same day the contract was entered into, replacing an existing Pepsi cooler in the store.  See Merritt Dep. at 69:3-72:14; Palmeri Aff. in Support, Ex. F.  It is unknown who actually placed, installed or plugged in the Pepsi cooler when it was delivered on November 5,

---

[3] There is conflicting testimony whether Pepsi would engage in "preventative maintenance" of coolers, meaning that once a Pepsi mechanic is called to service one specific cooler, the mechanic would check all the other coolers owned by Pepsi in that same store location to make sure they are in a state of good repair.  Orlando Rivera, a Pepsi refrigeration mechanic, testified that he provided preventative maintenance on the Pepsi machine on July 26, 2002, after being called into the store to service the Evian machine.  See Deposition of Orlando Rivera ("Rivera Dep.") at 37:19-38:11.  However, Joey Atkins, another Pepsi refrigeration mechanic, testified that when he appears at a location, such as Duane Reade, he only responds to the specific complaint, and would not inspect all coolers owned by Pepsi at that location, unless he receives a request from the vendor or from a supervisor.  Deposition of Joey Atkins ("Atkins Dep.") at 9:10-10:23.  Merritt, Pepsi's Marketing Equipment Manager in charge of supervising Rivera and Atkins, testified that it is Pepsi's policy never to provide preventative maintenance on coolers.  Merritt Dep. at 145:25-147:7.

[4] Pepsi originally tried to deliver the Pepsi cooler on October 26, 1998, but Duane Reade refused delivery.  Merritt Dep. at 69:3-72:14, Pl.'s Ex. 2.

1998.  <u>See</u> Khan Dep. at 20:7-10 (stating he has no knowledge of

who originally positioned the coolers); Merritt Dep. at 16:4-7,

17:17-24 (admitting he was not present on the day of

installation, but speculating that the manager of Duane Reade may

have been the one to decide where the Pepsi cooler would be

placed); Merritt Dep. at 19:11-14, 61:3-6 (stating he did not

know whether the Pepsi cooler was plugged in on the day of

installation, but, in general, Pepsi employees could plug in a

cooler when they install it "if there's an outlet available").

Neither party has provided deposition testimony from the Pepsi

employees who installed the Pepsi cooler at 1633 Broadway store

location on November 5, 1998.


**c. Maintenance services provided by Pepsi**

Pepsi serviced the Pepsi and Evian coolers[5] four times

between June 27, 2002 and September 1, 2002, the day of the fire.

The first service record indicating Pepsi came to the 1633

Broadway Duane Reade store is on June 27, 2002.  <u>See</u> Merritt Dep.

at 46:22-47:4.  On this date, Pepsi mechanic, Joey Atkins

("Atkins"), responded to a complaint that the "door string" on

---

[5] Pepsi was the owner of two refrigeration units in Duane
Reade's 1633 Broadway store.  Khan Dep. at 12:10-11; Merritt Dep.
at 24:16-25:17.  One was a three-door GDM69 Pepsi unit, serial
number 2161150, the cooler from where all experts agree the fire
originated.  <u>See</u> Merritt Dep. at 8:22-9:5.  The other unit was a
single-door, GDM23 Evian unit, serial number 2171997.  Merritt
Dep. at 25:2-17.

the Evian cooler was not working properly.  See Merritt Dep. at 99:4-19.  Although the work order report indicates that service was performed on the Evian GDM23 unit, see Merritt Dep., Pl.'s Ex. 7, all deposition testimony is consistent that only the Pepsi cooler had a door string, and that service was actually performed on the Pepsi cooler.  See Merritt Dep. at 29:8-32:10, 106:19-107:2 (testifying that the cooler fixed by Pepsi technicians on June 27, 2002 was the Pepsi cooler, not the Evian cooler, and that the work order "was keyed in under GDM23 instead of the GDM69"); Rivera Dep. at 41:11-42:19 (stating the GDM69 Pepsi unit has a door string while the GDM23 Evian unit does not); Atkins Dep. at 22:24-23:25 ("Q: Based on your knowledge of GDM23 [Evian] units, would there be any reason to ever reattach a door string? A: No, not to my knowledge.  Q: What about in regard to a GDM69 [Pepsi] unit? Would there ever be cause to attach or reattach a door string on that kind of unit?  A: Yes, there would.").

On July 26, 2002, Pepsi mechanic Orlando Rivera ("Rivera") visited the Duane Reade store to address Duane Reade's concerns that the Evian cooler was not cooling properly.  See Rivera Dep. at 33:11-34:11.  Rivera examined the Evian cooler and determined that the motor was "no good" and that "the compressor was burnt." Rivera Dep. at 34:15-36:8.  When he told the manager that the Evian cooler needed to be fixed or replaced as soon as possible, the manager directed him to replace the Evian cooler.  See Rivera

6

Dep. at 36:3-8; Merritt Dep., Pl.'s Ex. 8. During this same July 26 visit, although not requested by Duane Reade, Rivera testified that he also cleaned out the compressor of the Pepsi cooler as part of "preventative maintenance." See Rivera Dep. at 37:19-38:11; Merritt Dep. at 27:5-28:11, 90:7-91-22. Rivera found the Pepsi cooler to be cold and working properly. See Rivera Dep. 43:1-3, 44:24-45:3.

On July 31, 2002, Pepsi technicians returned to Duane Reade to pick up the old Evian cooler and replace it with either a new or refurbished Evian cooler. See Merritt Dep. at 55:7-15; Atkins Dep. at 54:13-55:3. There is no record of Pepsi servicing the Pepsi cooler on that day. See Merritt Dep. at 96:22-97:5.

On August 2, 2002, just three days after replacing the Evian machine, Atkins again returned to Duane Reade in response to a complaint that the Evian cooler was failing to properly cool. See Merritt Dep. at 117:22-121:16; Atkins Dep. at 35:5-37:19, 83:7-20. This was the third time within the approximate five-week period prior to the fire that Pepsi returned to Duane Reade for service.[6] Atkins found that the compressor in the Evian

---

[6] Duane Reade points out that it is unlikely that the new or refurbished Evian machine that Pepsi had installed at Duane Reade just three days earlier broke and suggests that the August 2, 2002 work order may have incorrectly named the Evian cooler as requiring service when, in fact, it was the Pepsi machine which needed service. As discussed, supra, Pepsi has admittedly confused the two coolers in the past. See, e.g., Merritt Dep. at 29:8-31:24 (testifying that the June 27, 2002 work order was inaccurately "keyed in under GDM23 instead of the GDM69").

cooler needed to be replaced "asap." See Merritt Dep. at 117:22-121:16, Pl.'s Ex. 11; Atkins Dep. at 35:5-37:19, 84:2-15. He later testified that he did not know whether the request for a replacement compressor was ever filled. See Atkins Dep. at 67:20-68:3. Atkins further testified that he did not have any independent recollection of speaking to anyone from Duane Reade about any problems with the Pepsi cooler, nor working on the Pepsi cooler on that day. See Atkins Dep. at 46:15-48:6.

**d. The fire**

On or about September 1, 2002, a fire began in Duane Reade. See Duane Reade's 56.1 Statement ¶ 5. All parties agree the power cord of the Pepsi cooler was the source of the fire. Id. See also Deposition of Larry Wharton ("Wharton Dep.") at 62:6-65:21; Deposition of Roger Boyle ("Boyle Dep.") at 59:17-60:20. However, Duane Reade's and Pepsi's experts disagree as to exactly how the power cord caused the fire to develop.

Duane Reade's expert, Larry Wharton ("Wharton"), first inspected the Pepsi cooler on the Duane Reade premises on September 3, 2002, two days after the fire. See Wharton Dep. at 21:20-22:1. Wharton's theory of causation is that the power cord of the Pepsi cooler was pinched between the cooler and a column to the left of the Pepsi cooler where the outlet that the Pepsi cooler was plugged into was located. See Wharton Dep. at 62:6-

8

65:21. Because there was insufficient cord available between the pinch point and the outlet, the plug could not be properly inserted into and aligned within the receptacle. See Wharton Dep. at 66:1-16; 74:23-75:3. Wharton opines that this improper placement caused side pressure on the cord, which caused a high-resistance connection to develop between the line blade of the plug and the receptacle. See Wharton Dep. at 75:10-19. Ultimately, this high resistance connection resulted in a "glowing connection," causing the copper to melt and arcing to occur, and, thus, served as the ignition source for the fire. See Wharton Dep. at 75:20-76:3.

Pepsi's expert, Roger Boyle ("Boyle), first inspected the Pepsi cooler in May 2003 at College Point, New York, New York, see Boyle Dep. at 43:7-45:11, and first inspected a section of electrical metallic tubing, including the power cord that had been cut from the Pepsi cooler, in June 2003 at Affiliated Engineering Laboratories in Edison, New Jersey, see Boyle Dep. at 46:7-48:18. Based on these examinations, Boyle opines that the power cord was crimped or pinched 12 centimeters from the plug. See Boyle Dep. at 59:17-60:20. At the pinch, the insulation deformed and allowed contact between the electrical conductors inside the power cord. See Boyle Dep. at 67:19-68:11. This contact caused a short circuit, which drained the current, and the electrical energy dissipated as heat, causing the fire. See

Boyle Dep. at 67:17-68:21. Boyle testifies that he does not know what specifically caused the pinching. See Boyle Dep. at 66:16-18.

## (2)

### Procedural History

On January 29, 2004, St. Paul Mercury on its own behalf and as subrogee of Mars 2112, brought this diversity action against defendants Duane Reade and Pepsi for damages suffered from the September 1, 2002 fire originating from the Pepsi cooler situated inside the premises leased by Duane Reade at 1633 Broadway, New York, New York 10019. See Compl. by St. Paul Mercury ¶¶ 6, 9. As a result of this fire, plaintiff alleges that Mars 2112, a restaurant located below Duane Reade, sustained damages caused by the water used in extinguishing the fire in excess of $292,359.07, including damage to personal property, loss of business income and extra expenses to St. Paul Mercury. See id. ¶¶ 7, 10. The complaint further alleges that the fire and resulting damage was directly and proximately caused by the negligent acts and omissions of Duane Reade and Pepsi. See id. ¶¶ 12-20.

On February 24, 2004, Duane Reade filed an Answer and brought a cross-claim against Pepsi for common-law and/or contractual indemnification, claiming, in the event Duane Reade

is found liable, it is entitled to indemnification from Pepsi because, <u>inter alia</u>, the damages sustained were caused by Pepsi's negligence. <u>See</u> Answer by Duane Reade ¶¶ 13-16. On March 16, 2004, Pepsi answered the complaint and brought a cross-claim against Duane Reade for contribution, common-law indemnity and contractual indemnity.[7] <u>See</u> Answer by Pepsi ¶¶ 13-17.

On June 15, 2004, St. Paul Fire and Marine Insurance Company ("St. Paul Fire"), as subrogee for Duane Reade, filed a separate cause of action against Pepsi. <u>See</u> Compl. by St. Paul Fire. St. Paul Fire sought reimbursement from Pepsi for the $497,000.00 insurance payments it made to Duane Reade for the fire damage to the 1633 Broadway store. <u>See</u> Compl. by St. Paul Fire ¶ 9. St. Paul Fire alleges that damages to Duane Reade's property were caused, <u>inter alia</u>, by Pepsi's negligence in installing, maintaining and properly inspecting the Pepsi cooler. <u>See</u> <u>id.</u> ¶¶ 9, 13-14. St. Paul Fire also brought a breach of contract claim against Pepsi. <u>See</u> <u>id.</u> ¶ 15. These cases were consolidated on March 15, 2005. <u>See</u> Minute Entry, dated March 15, 2005.

---

[7] Pepsi alleges that it entered into a contract with Duane Reade, wherein Duane Reade agreed to defend, indemnify and hold Pepsi harmless from claims such as the claim brought by plaintiff. Answer by Pepsi ¶ 17.

## Duane Reade's Motion for Summary Judgment

On May 10, 2006, defendant Duane Reade filed a motion for summary judgment, arguing that there were no triable issues of fact regarding Duane Reade's liability for the fire and asking that plaintiff's complaint against Duane Reade be dismissed.  See Palmeri Aff. in Supp. ¶¶ 2, 9.  Particularly, Duane Reade alleges that plaintiff lacks proof of any negligence on Duane Reade's part and argues that it has "produced ample evidence" that Duane Reade: 1) "did not and would not have moved the Pepsi refrigeration in question from the time of its installation in November, 1998 though the time of the fire in September, 2002"; and 2) "would not have had contact in anyway [sic] with the power cord to the [Pepsi] machine."  Duane Reade's Mem. of Law at 2. Having met this initial burden, Duane Reade argues that the burden now shifts to plaintiff to raise a triable issue of fact. See Duane Reade's Mem. of Law at 2.

In their opposition to the motion for summary judgment, plaintiff contends that there are three primary issues of material fact: 1) whether Duane Reade was responsible for placing or moving the cooler in question; 2) what ultimately caused the fire; and 3) whether defendant Duane Reade had a duty, and fulfilled this duty, to adequately inspect and maintain its property.  See Reback Aff. ¶ 2.

In response to Duane Reade's motion for summary judgment,
Pepsi submitted an affidavit stating that it "takes no position
in response to the relief requested" by Duane Reade, but noting
that it would like an opportunity to present its proofs in the
event that this Court "should deem it appropriate to consider
Duane Reade's motion a request for a finding that Pepsi
positioned the machine in the condition it was in at the time of
the fire or any other specific finding concerning any material
fact pertaining to Pepsi."  Affidavit of Christopher P. Di Giulio
("Di Giulio Aff."), dated June 30, 2006.

## Discussion

## (1)

## Applicable Legal Standards

### a. Summary judgment standard

Summary judgment is granted when it is shown that "there is
no genuine issue as to any material fact and that the moving
party is entitled to a judgment as a matter of law."  Fed. R.
Civ. P. 56(c).  See also Celotex Corp. v. Catrett, 477 U.S. 317,
322-23 (1986).  When considering a motion for summary judgment,
"the court's responsibility is not to resolve disputed issues of
fact but to assess whether there are any factual issues to be
tried, while resolving ambiguities and drawing reasonable

inferences against the moving party." <u>Knight v. U.S. Fire Ins. Co.</u>, 804 F.2d 9, 11 (2d Cir. 1986) (citing <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 249-50 (1986)).

Where, as here, the non-moving party will bear the burden of proof at trial, the party moving for summary judgment may meet its burden by showing the evidentiary materials of record, if reduced to admissible evidence, would be insufficient to carry the non-movant's burden of proof at trial. <u>See</u> <u>Celotex</u>, 477 U.S. at 322-23. In such a case, a moving defendant need not negate a non-moving plaintiff's position, but simply has to "'show[] – that is, point[] out to the district court – that there is an absence of evidence to support the nonmoving party's case.'" <u>Crum & Forster Specialty Co. v. Safety Fire Sprinkler Corp.</u>, 405 F. Supp. 2d 223, 227 (E.D.N.Y. 2005) (quoting <u>Celotex</u>, 477 U.S. at 325). <u>See also</u> <u>Rubner v. Wal-Mart Stores, Inc.</u>, No. 94-CV-0537, 1996 WL 189507, at *1 (W.D.N.Y. Apr. 16, 1996). In such a situation, there can be "no genuine issue as to any material fact," since "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." <u>Celotex</u>, 477 U.S. at 322-23 (citations omitted).

Once confronted with a properly supported summary judgment motion, the plaintiff must come forward with specific facts "to allow a reasonable jury to find in his favor." <u>Lizardo v.</u>

14

Denny's Inc., 270 F.3d 94, 101 (2d Cir. 2001).  Neither

"metaphysical doubt" concerning the facts, Matsushita Elec.

Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986), nor

the "mere existence of a scintilla of evidence in support of the

plaintiff's position" is sufficient to defeat a summary judgment

motion, Anderson, 477 U.S. at 252.  See also D'Amico v. City of

New York, 132 F.3d 145, 149 (2d Cir. 1998) ("The non-moving party

may not rely on mere conclusory allegations nor speculation, but

instead must offer some hard evidence showing that its version of

the events is not wholly fanciful."); Goenaga v. March of Dimes

Birth Defects Found., 51 F.3d 14, 18 (2d Cir. 1995) (noting that

conclusory statements, conjecture and other types of unsupported

assertions are not sufficient to defeat a motion for summary

judgment).  Similarly, "a 'bare assertion that evidence to

support a fanciful allegation lies within the exclusive control

of the defendants, and can be obtained only through discovery, is

not sufficient to defeat a motion for summary judgment.'"

Knight, 804 F.2d at 12 (quoting Eastway Constr. Corp. v. City of

New York, 762 F.2d 243, 251 (2d Cir. 1985).  Rather, it is

incumbent upon a non-moving party to set forth "'supporting

arguments or facts in opposition to the motion.'"  Eastway

Constr. Corp., 762 F.2d at 249 (quoting SEC v. Research

Automation Corp., 585 F.2d 31, 31 (2d Cir. 1978)).

**b. Prima facie negligence claim**

In an action for negligence, to defeat a motion for summary judgment, "'the plaintiff must introduce adequate evidence on each element of negligence sufficient to support a favorable jury verdict[, and] . . . in cases where proof of any essential element falls short the case should go no further.'" Stanton v. Manhattan E. Suite Hotels, No. 01-CV-2394, 2002 WL 31641127, at *2 (S.D.N.Y. Nov. 22, 2002) (quoting Basso v. Miller, 40 N.Y.2d 233, 242, 352 N.E.2d 868, 873, 386 N.Y.S.2d 564, 569 (1976)).

In this diversity action, in order for plaintiff to establish a prima facie case of negligence against Duane Reade under New York state law, it must prove that: 1) Duane Reade owed a duty to plaintiff; 2) Duane Reade breached that duty by its negligent conduct; and 3) that breach was the proximate cause of the plaintiff's damages. See, e.g., Solomon v. City of New York, 66 N.Y.2d 1026, 1027, 489 N.E.2d 1294, 1294, 499 N.Y.S.2d 392, 392 (1985). "The existence and scope of duty is, in New York, a legal question, to be answered by the Court of Appeals in a broad, categorical fashion." Di Benedetto v. Pan Am World Serv., Inc., 359 F.3d 627, 630 (2d Cir. 2004) (citing Stagl v. Delta Airlines, Inc., 52 F.3d 463, 469 (2d Cir. 1995).

**c. Use of circumstantial evidence to prove a negligence claim**

In its motion for summary judgment, Duane Reade points to

16

the absence of evidence to support plaintiff's claims.
Specifically, Duane Reade points out that plaintiff has no
evidence to substantiate plaintiff's allegations that Duane Reade
negligently positioned, installed or moved the Pepsi cooler,
touched the power cord, failed to allow Pepsi to service the
Pepsi machine or failed to detect the pinching or crimping of the
power cord which caused the fire.  Duane Reade's Mem. of Law at
2, 4-5.  Then, although not necessary to establish its
entitlement to summary judgment, see Crum & Forster Specialty
Co., 405 F. Supp. 2d at 227 (quoting Celotex, 477 U.S. at 325),
Duane Reade points to specific deposition testimony negating
plaintiff's claims that Duane Reade owed a duty to plaintiff or
acted negligently.  Palmeri Aff. in Supp. ¶¶ 10-22.

In opposition, plaintiff admits that it has no evidence to
demonstrate whether Duane Reade inspected its property for a
dangerous condition, nor whether those efforts were reasonable,
Reback Aff. ¶ 11, and further "concedes that its insured [Mars
2112] would have no direct evidence regarding the placement or
movement of the [Pepsi] machine," Reback Aff. ¶ 3.  Thus,
plaintiff must rely on circumstantial evidence to make out its
prima facie case of negligence against Duane Reade.

Under New York state and federal law, a plaintiff may rely
solely on circumstantial evidence to make out a prima facie case
of negligence if the record supports an inference of negligence,

"even it if does not rule out 'the existence of remote possibilities that the injury was not caused by the defendant, or that the defendant was not negligent.'" <u>Olsen v. K Mart Corp.</u>, No. 04-CV-3648, 2005 WL 2989546, at *5 (E.D.N.Y. Nov. 8, 2005) (quoting <u>Dillon v. Rockaway Beach Hosp. & Dispensary</u>, 284 N.Y. 176, 179, 30 N.E.2d 373, 374 (1940)). Although plaintiff's proof need not "positively exclude every other possible cause of the accident but defendant's negligence," plaintiff is required to render those other causes sufficiently "remote" or "technical" so that the jury may reach its verdict based on logical inferences to be drawn from the evidence, not upon speculation. <u>Schneider v. Kings Highway Hosp. Ctr., Inc.</u>, 67 N.Y.2d 743, 744, 500 N.Y.S.2d 95, 95, 490 N.E.2d 1221, 1221 (1986) (internal quotation marks and citations omitted). <u>See also</u> <u>Prunier v. City of Watertown</u>, 936 F.2d 677, 680 (2d Cir. 1991) (quoting <u>Bernstein v. City of New York,</u> 69 N.Y.2d 1020, 1021, 517 N.Y.S.2d 908, 909, 511 N.E.2d 52, 53 (1987) ("A jury verdict must be based on more than mere speculation or guesswork."). This Court has noted that:

> [w]hile there may be a fine line between circumstantial evidence pointing towards a probable source of creation and bald speculation, [w]here the facts proven show that there are several possible causes of an injury, for one or more of which the defendant was not responsible, and it is just as reasonable and probable that the injury was the result of one cause as the other, plaintiff cannot have a recovery, since he has failed to prove that the negligence of the defendant caused the injury.

<u>Olsen</u>, 2005 WL 2989546, at *5 (quoting <u>Bernstein</u>, 69 N.Y.2d at 1021, 511 N.E.2d at 53, 517 N.Y.S.2d at 909 (internal quotation marks and citations omitted)).

## d. Multiple defendants in negligence actions

Where either of two actors may have been the cause of plaintiff's injuries, but only one is negligent, a plaintiff has not made out a case against either unless he or she establishes which actor negligently caused the injury. <u>See, e.g</u>, <u>Wolf v. American Tract Soc.</u>, 164 N.Y. 30, 32-35, 58 N.E. 31, 33-34 (1900). On the other hand, if an injury is caused by the negligence of one of two negligent actors, but it cannot be determined which actor caused the injury, both negligent defendants may be held liable, <u>Hymowitz v. Eli Lilly & Co.</u>, 73 N.Y.2d 487, 505, 539 N.E.2d 1069, 1073, 541 N.Y.S.2d 941, 945 (1989). <u>See also</u> N.Y. Pattern Jury Instr.- Civil 2:71, at 375 (2007).

### (2)

### Duane Reade's Responsibility for Placing or Moving the Pepsi Cooler

Duane Reade argues that plaintiff does not have evidence that Duane Reade negligently installed or moved the Pepsi cooler, or had any contact with the power cord. <u>See</u> Palmeri Aff. in Supp. ¶¶ 10-22; Reply Aff. ¶¶ 4-6. Furthermore, Duane Reade

offers evidence that Pepsi installed the cooler and that Duane Reade did not place or move the Pepsi cooler or have contact with the power cord.

As to installation and placement of the cooler, Farhaad Yacoob ("Yacoob"), Duane Reade's store manager at the time the Pepsi cooler was delivered, testified that based both on his knowledge of custom and practice as well as his direct observations and his own practices that "no Duane Reade employee has ever or would ever install . . ." a cooler at the 1633 Broadway location, Affidavit of Farhaad Yacoob ("Yacoob Aff.") at 1-2, and that all installations were performed by Pepsi, <u>see</u> Yacoob Aff. at 2.

As to movement of the Pepsi cooler, Duane Reade has offered testimony showing that it did not move the refrigeration unit in question.  For example, Yacoob testified that no Duane Reade employee has ever or would ever move a Pepsi cooler.  <u>See</u> Yacoob Aff. at 1-2.  Furthermore, Shahab Khan ("Khan"), Duane Reade's manager from January 2001 though the time of the fire on September 1, 2002, indicated that while he was manager, none of the coolers were ever moved by Duane Reade personnel, <u>see</u> Khan Dep. at 41:16-23 ("We didn't move the coolers at all.  Any maintenance or anything pertaining to the coolers we dealt with the vendor. We had enough on our plate."), nor were they moved by any contractors or electricians, <u>see</u> Khan Dep. at 41:24-44:13,

59:22-60:11, and that the cleaning staff did not clean behind the machines, see Khan Dep. at 60:19-21. Khan further testified that his personal approval was necessary before any cooler, including the Pepsi cooler, could be moved and he did not recall any requests to move the Pepsi cooler from anyone, including the district manager, between his start date, January 2001, and the date of the fire, September 1, 2002. See Khan Dep. at 39:21-42:8; 46:7-12.

Additionally, Duane Reade has pointed to testimony establishing that the Pepsi cooler was extremely heavy and not easily susceptible to movement. Atkins, a mechanic and technician employed by Pepsi, stated that he would "never advise anyone to ever move a Pepsi machine" on their own, because "it's a big, heavy piece of equipment and we move it for you. You can call up and have it moved." See Atkins Dep. at 71:12-25. In response to the question whether it was standard practice for a Pepsi representative to move a machine that needs to be moved, Atkins answered, "[i]f a machine needs to be moved, yeah, they would call up and tell Pepsi 'I need a machine moved' and we would send somebody down and move a machine." Atkins Dep. at 79:15-80:1. Additionally, Merritt stated that when a field mechanic attempts to repair a Pepsi cooler and the power cords are behind the unit, they won't be able to check those connections because "[t]hey can't physically pull the unit out

when it's a 700-pound unit and it's full of product." Merritt
Dep. at 86:7-12.

Duane Reade has further offered deposition testimony that
none of its employees had any contact with the power cord of the
Pepsi cooler. Khan indicates that he never saw the plug of the
cooler, never plugged or unplugged the cooler and never knew any
Duane Reade employee to have plugged or unplugged the Pepsi
cooler, or any other cooler in the store. See Khan Dep. at
44:20-45:7, 46:24-47:24. Khan also testified that cleaning staff
never used the outlets in the vicinity of the coolers. See Khan
Dep. at 55:20-57:1 (stating that the only outlet used for
cleaning the area around the Pepsi cooler was a plug located in
the lunch room). This cumulation of evidence demonstrates that
Duane Reade has established that they did not install, place or
move the Pepsi cooler or had any contact with the power cord.

In order to defeat Duane Reade's showing, plaintiff must
come forward with evidence that raises a triable issue of fact
whether Duane Reade somehow caused the defective condition - i.e.
by negligently installing or moving the Pepsi cooler or by
negligently causing the defective condition on the power cord.
However, in opposition, plaintiff first "concedes that its
insured [Mars 2112] would have no direct evidence regarding the
placement or movement of the [Pepsi] machine," Reback Aff. ¶ 3,
and then fails to come forward with circumstantial evidence that

Duane Reade installed or moved the Pepsi machine or had any
contact with the power cord.  Plaintiff attempts to cover up the
fact that it has no evidence to make out its negligence claims by
impermissively attempting to shift its burden to raise material
issue of triable fact onto Duane Reade.  Specifically, plaintiff
argues that because Duane Reade has not provided any direct
statements by any witness regarding the placement or movement of
the cooler, there is a question of fact as to the reasonableness
of Duane Reade's placement or movement of the Pepsi machine.  <u>See</u>
Reback Aff. ¶ 3.  Additionally, plaintiff attacks Duane Reade's
showing that it did not install the Pepsi machine by arguing that
Duane Reade's evidence falls short of establishing that there was
"standard practice or procedure followed by Pepsi regarding"
installation of cooler, as mandated by the Federal Rules of
Evidence Rule 406.[8]  <u>See</u> Reback Aff. ¶ 3.  However, Duane Reade
does not have to prove Pepsi installed the Pepsi cooler or
establish Pepsi's standard installation practice under Federal
Rules of Evidence Rule 406, but only has to point out that there
is no evidence that it installed the cooler.  <u>See, e.g.</u>, <u>Crum &
Forster Specialty Co.</u>, 405 F. Supp. 2d at 227 (quoting <u>Celotex</u>,

---

[8] It is interesting to note that in a pre-motion conference
letter to the court, plaintiff states, "[d]espite Pepsi's denial
that there is evidence that it installed the chiller, the record
indicates that it was the routine practice of defendant Pepsi to
install the beverage chillers displaying product."  March 6, 2006
Letter by Steven Reback at 2.

477 U.S. at 325). Thus, both arguments are insufficient to raise a triable issue of fact.

As an alternative to offering evidence tending to show that Duane Reade installed, placed or moved the Pepsi machine or touched the power cord, plaintiff argues that even if Pepsi did install, place and move the cooler, Pepsi did so under the control and direction of Duane Reade employees and for the benefit of Duane Reade, and, therefore, Duane Reade is not absolved from its duty to place the machine using reasonable care.[9] Reback Aff. ¶ 4. Ultimately, this argument cannot raise a material issue of fact precluding summary judgment because there is no evidence in the record to indicate that placement of the Pepsi cooler within Duane Reade caused the fire and neither expert proffers this as a theory of causation.[10] Instead, both

---

[9] In support of this argument, plaintiff states that "Duane Reade personnel actually did instruct Pepsi-Cola personnel where to place the subject beverage chiller" and cites to Merritt's testimony that the manager of Duane Reade may have been the one to decide where the Pepsi cooler would be placed, <u>see</u> Merritt Dep. at 17:17-24, and that Merritt never saw a Pepsi driver or helper suggest where to place a Pepsi cooler, <u>see</u> Merritt Dep. at 62:22-63:9.

[10] In fact, deposition testimony of record establishes that the Pepsi machine was placed in close proximity to the outlet and that the power cord was long enough to reach the plug. For example, Wharton testifies that while there was sufficient power cord to reach from the back of the Pepsi cooler to the outlet, because of the way the power cord was pinched at column, there became insufficient cord to reach from the pinch point to the outlet. <u>See</u> Wharton Dep. at 97:3-12 ("I went behind the [Pepsi] machine and there was considerable slack in the power cord where it came out of the back of the machine and it was routed between

24

experts agree that the fire was caused by a pinching of the power cord and there is no evidence that Duane Reade had any contact with that power cord. Thus, even if Duane Reade did tell Pepsi where to place the machine, the relevant inquiry here is who plugged in the machine, not where in the Duane Reade the Pepsi cooler was placed. <u>See</u> Reply Aff. ¶ 7 (noting that plaintiff concedes in its opposition papers that the issue in this case concerns who caused the cord to be crimped). As there is no direct or circumstantial evidence on record that the placement of the Pepsi cooler within the Duane Reade store caused the fire, plaintiff's theory fails to raise any triable issues of material fact tending to prove that Duane Reade negligence in placing the Pepsi cooler caused the fire.

### (3)

### Circumstantial Evidence of Fault Provided by Differing Expert Opinions as to the Cause of the Fire

Plaintiff next attempts to raise an issue of material fact in opposition to Duane Reade's summary judgment motion by

---

the machine and the column to the front of the machine, so there was slack back there. But of course the cord was pinched at the front of the machine and, therefore, not allowing sufficient length for the plug to be properly engaged."). Thus, Wharton's theory of causation centers around the way the power cord was positioned between the column next to the Pepsi cooler and the Pepsi cooler, not where in relation the Pepsi cooler was to the outlet or where in the store the Pepsi cooler was placed. <u>See</u> Wharton Dep. at 97:3-12.

asserting that the differing expert opinions as to the cause of the fire creates conflicting circumstantial evidence as to who is responsible for the fire.  See Reback Aff. ¶¶ 5, 9.

All the parties agree that the source of the fire was the power cord of the Pepsi cooler.  See Duane Reade's 56.1 Statement ¶ 5.  However, the parties' experts disagree as to the cause of the fire; or, more specifically, who was responsible for causing the crimping or pinching that led to the fire.  Duane Reade's expert, Wharton, suggests that the fire was caused by a "glowing connection" that occurred as a result of side pressure on the plug which prevented the plug from being flush with the outlet. See Wharton Dep. at 62:6-65:21, 74:23-75:3.  On the other hand, Pepsi's expert, Boyle, suggests that the fire occurred due to a short circuit and subsequent overheating of the power cord caused by a pinch or crimp in the cord approximately 12 centimeters from the plug.  See Boyle Dep. at 59:17-60:20, 67:17-68:21.

Plaintiff asserts that this distinction between the two theories is "significant and presents a genuine issue of material fact precluding summary judgment" as the different causation theories present different time frames, which, in turn, contribute to different inferences as to who may be responsible for the fire.  See Reback Aff. ¶¶ 7-8.  If, for example, the fire was caused by a "glowing connection," as suggested by Wharton, then the pressure on the cord could have existed for a

"relatively short or relatively long period of time" before
ultimately resulting in a glowing connection.  <u>See</u> Wharton Dep.
at 87:7-12.  The inference plaintiff argues the jury could draw
from Wharton's theory is that the cord was pinched at the time
the machine was first delivered and installed by Pepsi, and,
therefore, Pepsi alone is responsible.  <u>See</u> Reback Aff. ¶ 7.  If,
however, the fire was caused by a pinch or crimp in the wire,
which led to a short circuit and subsequent overheating of the
power cord, as suggested by Boyle, then the time period between
the onset of the crimping and the fire would typically be much
shorter.  <u>See</u> Boyle Dep. at 61:9-16.  Plaintiff argues that if
the jury were to credit Boyle's theory of the causation, it could
reasonably infer that the crimp in the cord was not present at
the time of installation, and that Duane Reade moved the Pepsi
machine or touched the power cord subsequent to installation,
causing the crimp that caused the fire and, therefore, Duane
Reade alone is responsible.  <u>See</u> Reback Aff. ¶ 8.

    Plaintiff's theory would force the trier of fact to engage
in mere speculation.  Neither causation theory is conclusive as
to the timing of the fire and both experts ultimately admit that
the condition could have persisted for an undetermined length of
time.  For example, although Boyle's theory presents a
potentially shorter period, both experts admit that the timing is
not predictable.  <u>See</u> Wharton Dep. at 87:7-88:3 ("A high-

resistance connection can persist for an undetermined length of time . . . No, I can't put a specific time on it."); see Boyle Dep. at 61:9-16 ("It could have been seconds, minutes, days. The answer is no, I don't know [how long the condition could have existed]."); Boyle Dep. at 63:13-17 (agreeing that condition could have existed from a minute up to a month). Furthermore, neither expert rules out the possibility that the crimp was present from the moment of installation. See, e.g., Boyle Dep. at 106:24-108:4 (conceding that "it is possible that the cord was crimped prior to installation"); Wharton Dep. at 111:11-22 (stating that it is more likely that the crimp occurred at the time of installation).[11]

Nonetheless, even if one accepts Boyle's theory of causation and accepts that the defective condition lasted anywhere from seconds to a month before the fire, there are no facts which make it more likely that the fire was caused by any actions on Duane Reade's part as opposed to any actions on Pepsi's part. The trier of fact could speculate equally well that Pepsi's own employees, who were at the Duane Reade location to provide maintenance to the Pepsi cooler four times in the two month

---

[11] In its pre-motion conference letter opposing both Pepsi's and Duane Reade's requests for leave to file a summary judgment motion, plaintiff itself states that "[n]either expert was able to state the length of time that these conditions existed before the fire and neither ruled out that the condition that caused the fire was present at the time the chiller was installed." March 6, 2006 Letter by Steven Reback at 2.

period preceding the fire, did something to damage the power cord. Although it is plausible that a Duane Reade employee may have pushed something against the power cord and damaged it, plaintiff has offered no proof that this occurred. Thus, whether the fire was caused by a "glowing connection" or an "overheating" of the cord does not make it any more likely that one party was, or was not, responsible. See Bernstein, 69 N.Y.2d at 1021, 511 N.E.2d at 53, 517 N.Y.S.2d at 909 ("[w]here the facts proven show that there are several possible causes of an injury, for one or more of which the defendant was not responsible, and it is just as reasonable and probable that the injury was the result of one cause as the other, plaintiff cannot have a recovery, since he has failed to prove that the negligence of the defendant caused the injury.").


### (4)

### Duane Reade's Duty to Inspect and Maintain its Property

Although plaintiff has failed to raise a triable issue of fact whether Duane Reade caused the defective condition by negligently installing, placing or moving the Pepsi machine or touching the power cord, it is clear that a dangerous condition existed on its premises, whether caused by Pepsi's interaction with the cooler, a defect in the power cord present before

installation or by some other intervening cause.  Thus, plaintiff
may defeat Duane Reade's summary judgment motion if it can raise
a triable issue of fact whether Duane Reade had a duty to
reasonably inspect its premises for this defect and, if it had a
duty, whether Duane Reade reasonably fulfilled that duty.

Duane Reade argues that plaintiff lacks any evidence that
Duane Reade was responsible for maintaining the Pepsi machine,
see Palmeri Aff. in Supp. ¶ 19, or had a duty to inspect the
power cord of the Pepsi cooler for defects or to maintain its
property free of defects, see Reply Aff. ¶¶ 11-21.  Khan, who was
the manager of Duane Reader from January 2001 though the time of
the fire on September 1, 2002, see Khan Dep. at 7:20-8:12,
testified that Pepsi performed "[a]ny maintenance or anything
pertaining to the coolers."  Khan Dep. at 41:20-22.  Khan
explained that he would do a visual inspection of the coolers,
see Khan Dep. at 21:5-12, and would put in a maintenance request
if he observed: 1) the coolers were not cooling; 2) the door
would not shut properly; or 3) the shelves inside the cooler
fell, see Khan Dep. at 25:2-10; 26:16-27:17, 30:11-31:20.
Whenever the Pepsi machines needed maintenance, either Khan or an
assistant manager would call the vendor, Pepsi, at a 1800 number,
see Khan Dep. at 18:23-24, 20:21-21:4.  However, because it would
often take Pepsi a while to come to the store to repair the

problem, Khan testified that he would either refuse the deliveries from the distributor until Pepsi fixed the problem or would have the distributor place the call to Pepsi to fix the cooler.  <u>See</u> Khan Dep. at 25:13-26:15; 27:11-28.  Khan testified that having the distributor place the call to Pepsi resulted in Pepsi repairing the cooler in a more urgent fashion.  <u>See</u> Khan Dep. at 27:11-28:4.

All testimony appended to Duane Reade's motion papers corroborates Khan's account and is consistent that Pepsi performed all maintenance and service to the Pepsi cooler. Yacoob, Duane Reade's store manager through the time the Pepsi cooler was delivered, testified that "no Duane Reade employee has ever or would ever . . . repair  . . . or maintain Pepsi refrigeration units."  Yacoob Aff. at 2.  Merritt conceded that it is Pepsi's responsibility to maintain the Pepsi cooler.  <u>See</u> Merritt Dep. at 34:12-37:11 (Q: "[D]o you know whose responsibility it was to maintain that Pepsi machine [at the 1633 Broadway Duane Reade store]?"  A: Yes. Q: [Whose]?  A: Pepsi's.").  Finally, Rivera, one of the Pepsi mechanics who worked on the Pepsi cooler testified that "[w]hen they called for - the machine is broken or something, we come down and we check the machine . . .".  <u>See</u> Rivera Dep. at 32:21-25.

In response to this showing, instead of coming forward with

evidence that Duane Reade actually had a duty to maintain and
inspect the Pepsi cooler, plaintiff contends that summary
judgment should not be granted in Duane Reade's favor because
Duane Reade had a duty to make reasonable efforts to inspect its
property for dangerous conditions, and, because Duane Reade's
"summary judgment evidence does not contain testimony or
affidavits that state what efforts defendant took to inspect its
property for dangerous conditions. . . nor whether such efforts
were reasonable," Reback Aff. ¶ 11, there is a question of fact
as to the adequacy of Duane Reade's inspection, Reback Aff. ¶ 10.
Plaintiff further argues that "had defendant inspected its
property even minimally, according to its own expert, it would
have noticed the pinched or crushed cord that both experts agree
was the cause of the fire," Reback Aff. ¶ 11, and that Duane
Reade's summary judgment evidence "implies that it made no
efforts at all to inspect electrical cords on its premises,"
Reback Aff. ¶ 11.

This argument is insufficient to defeat Duane Reade's motion
for summary judgment.  The Second Circuit has made clear that,
upon a moving party's showing that there is an absence of
evidence to support the non-moving party's case, the non-moving
party must set forth "supporting arguments or facts in opposition
to the motion," Eastway Constr. Corp., 762 F.2d at 249 (quoting

Research Automation Corp., 585 F.2d at 31), and that "'bare assertion[s] that evidence to support a fanciful allegation lies within the exclusive control of the defendants, and can be obtained only through discovery, is not sufficient to defeat a motion for summary judgment,'" Knight, 804 F.2d at 12 (quoting Eastway Constr. Corp., 762 F.2d at 251).  Plaintiff admits that it has no evidence to demonstrate whether Duane Reade even undertook such an inspection, and, instead, attempts to negate its failure to produce evidence sufficient to defeat a motion for summary judgment by, once again, impermissibly shifting its burden onto Duane Reade to establish that Duane Reade was not negligent in the inspection of its property.

Furthermore, plaintiffs have set forth no case law to indicate that Duane Reade actually owed a duty to the business located beneath Duane Reade to inspect for a pinched or crimped power cord on one of the refrigeration units on its premises. Under New York state law, in order for the defendant to be charged with the duty to correct a hazard on its premises, "the plaintiff must show that the [premise possessor or owner] either created the defective condition, or had actual or constructive notice of the defective condition for such a period of time that, in the exercise of reasonable care, it should have corrected it." Abrams v. Powerhouse Gym Merrick, Inc., 284 A.D.2d 487, 487-88,

727 N.Y.S.2d 135, 136 (2d Dep't 2001).  Here, plaintiff does not allege that Duane Reade created the condition or had actual notice of it.  Instead, plaintiff contends that Duane Reade should have inspected its premises for the pinched cord; that is to say, Duane Reade should be charged with having had constructive notice of the defective power cord.

In order to show that a premise owner had "constructive notice" of a dangerous condition on his property, "evidence must establish that the dangerous condition was visible and apparent, and existed for a sufficient length of time prior to the accident to permit the property owner to discover the condition and remedy it."  Camelio v. Wal-Mart Stores, Inc., 15 F. Supp. 2d 268, 269-70 (W.D.N.Y. 1998) (emphasis added).  See also Gordon v. American Museum of Natural History, 67 N.Y.2d 836, 837, 492 N.E.2d 774, 775, 501 N.Y.S.2d 646, 647 (1986) ("[t]o constitute constructive notice, a defect must be visible and apparent . . . ").  The deposition testimony Duane Reade has submitted suggests that the plug of the Pepsi machine was not visible.  See, e.g., Khan Dep. at 79:9-20 (stating that the plug of the Pepsi machine was "not visible"); Atkins Dep. at 73:22-74:25 (Pepsi mechanic indicating that he does not inspect the power cord because the "the power cord is not visible"); Khan Dep. at 76:16-77:18 (stating there was a six foot wire and plastic chip display rack positioned

directly in front of the outlet the Pepsi cooler's power cord was plugged into); Wharton Dep. at 46:3-21 (same).  This is sufficient to shift the burden to plaintiff to raise an issue of fact establishing that the crimp on the power cord was visible and apparent and that the condition existed for a sufficient length of time for Duane Reade to have discovered and remedied it.  See, e.g., Sheehan v. J.J. Stevens & Co., Inc., 39 A.D.3d 622, 622-23, 833 N.Y.S.2d 237, 238 (2d Dep't 2007) (finding moving party submitted evidence sufficient to demonstrate that it had no constructive notice of the condition); Atkinson v. Golub Corp. Co., 278 A.D.2d 905, 906, 718 N.Y.S.2d 546, 548 (4th Dep't 2000) (moving party's deposition testimony that the puddle was not visible and apparent prior to the accident was sufficient to establish defendant's lack of constructive notice in a slip and fall case).

Now, the burden shifts to plaintiff to raise a triable issue of fact as to whether Duane Reade had constructive notice of the faulty power cord.  See Sheehan, 39 A.D.3d at 622, 833 N.Y.S.2d at 238 (discussing allocation of burden).  The only evidence plaintiff proffers in opposition is an assertion by Wharton, Duane Reade's expert, that "(t)he tension on the plug should have been evident, if one were to observe it."  Wharton Dep. at 108:3-6.  However, it does not follow that just because one observing

the cord could see the tension on the cord that the cord itself was visible. Indeed, both Khan and Wharton stated that there was a six foot wire and plastic chip display rack with six shelves positioned directly in front of the outlet. See Khan Dep. at 76:16-77:18; Wharton Dep. at 46:3-21, 51:21-52:1.[12] Thus, plaintiff has failed to produce any evidence tending to show that the defect was visible and apparent, nor that defect was sufficiently longstanding to give defendants an opportunity to correct it.[13] See, e.g., Andrews v. Porreca, 227 A.D.2d 940, 941, 643 N.Y.S.2d 250, 250 (4th Dep't 1996) (defendant entitled to summary judgment where plaintiff failed to raise a factual issue

---

[12] By the time Wharton observed the area, the wire and plastic chip display rack had melted in the fire. As such, when he was asked directly whether one standing in front of the wire and plastic chip display rack would have been able to see the outlets, Wharton answered that he did not know whether there "would be product hanging at that level to cover the observation of the receptacles or not." Wharton Dep. at 52:12-8. Plaintiff has not offered any evidence regarding whether the placement of the wire and plastic chip display rack impacted the visibility of the power cord or when the wire and plastic chip display rack was placed in front of the outlet. Thus, to the extent that any of these questions would have impacted the instant analysis, there is no reason to address them.

[13] As discussed, infra, plaintiff has raised only speculative evidence of how long the defect in the power cord existed prior to the fire. For example, Boyle testified that the defective condition could have been present for "seconds, minutes, days." Boyle Dep. at 61:11-12. Wharton testified that the defective condition could have been present for a "relatively short or relatively long period of time" before ultimately resulting in a glowing connection. See Wharton Dep. at 87:7-12.

as to whether defendants, who had leased the premises to plaintiff's employers, had actual or constructive notice of the alleged dangerous condition of an electrical outlet); De Vizio v. Hobart Corp., 142 A.D.2d 508, 510, 530 N.Y.S.2d 144, 146 (1st Dep't 1988) (defendant entitled to summary judgment where there was nothing in the record to suggest that defendant knew, or with due diligence should have known, that the electrical receptacle or plugs were defective).

**(5)**

**Insufficient Circumstantial Evidence to Prove Elements of Negligence**

Plaintiff argues that all it needs to do in order to survive Duane Reade's motion for summary judgment is to "merely show a reasonable probability that the accident was caused by defendant's negligence."  Reback Aff. ¶ 11 (citing Williams v. KFC Nat'l Mgmt. Co., 391 F.3d 411 (2d Cir. 2004).  As discussed previously, while the plaintiff is "not required to adduce the most reasonable explanation for the accident, nor . . . to eliminate all other possible causes" of the accident in order to avoid summary judgment, Williams, 391 F.3d at 420, the plaintiff must show that the evidence presented makes other possible explanations too "remote" or "technical" in comparison to the

explanation offered, <u>Williams</u>, 391 F.3d at 422.  Where the plaintiff is unable to point to circumstantial evidence that tends to "prove that it was more likely or more reasonable that the alleged injury was caused by the defendant's negligence than by some other agency," <u>Gayle v. City of New York</u>, 92 N.Y.2d 936, 937, 703 N.E.2d 758, 759, 680 N.Y.S.2d 900, 901 (1998), plaintiff cannot recover, <u>see, e.g.</u>, <u>Wolf v. American Tract Soc.</u>, 164 N.Y. 30, 32-35, 58 N.E. 31, 33-34 (1900) (holding in a <u>res</u> <u>ipsa</u> case with multiple potential defendants that "[i]f the plaintiff was unable to give proof pointing to the party responsible for the injury, that is no reason why the innocent and the guilty should be held in a body upon a presumption that some or all were negligent").

Here, discovery has closed and, based on the summary judgment record, plaintiff has failed to provide circumstantial evidence sufficient for a jury to reasonably infer that it was more likely that Duane Reade's negligence, rather than negligence on Pepsi's behalf or some other factor, caused the fire.  "If the circumstantial evidence presented lends itself equally to several conflicting inferences, the trier of fact is not permitted to select the inference it prefers, since to do so would be the equivalent of engaging in pure speculation about the facts." <u>Mehra v. Bentz</u>, 529 F.2d 1137, 1139-40 (2d Cir. 1975).  <u>See also</u>

38

<u>Olsen v. K Mart Corp.</u>, 2005 WL 2989546, at *5 ("[S]peculation
absent any evidence, direct or circumstantial, will not defeat a
motion for summary judgment."). As plaintiff has not rendered
"other causes sufficiently 'remote' or 'technical' to enable the
jury to reach its verdict based not upon speculation, but upon
the logical inferences to be drawn from the evidence," <u>Schneider</u>,
67 N.Y.2d at 744, 500 N.Y.S.2d at 95, 490 N.E.2d at 1221 (1986)
(citations omitted), plaintiff cannot defeat Duane Reade's motion
for summary judgment.  <u>See, e.g.</u>, <u>Moorman v. Huntington Hosp.</u>,
262 A.D.2d 290, 290, 691 N.Y.S.2d 548, 549 (2d Dep't 1999)
(summary judgment in negligent maintenance action affirmed
because "plaintiff's assertions that only employees had access to
the utility room and therefore only an employee of the defendant
could have created the hazardous condition [was] speculative and
unsupported by any evidence in the record"); <u>Babino v. City of
New York</u>, 234 A.D.2d 241, 241-42, 650 N.Y.S.2d 778, 779 (2d Dep't
1996) (affirming summary judgment in negligence case where there
were no witnesses to accident and plaintiff could not state how
accident occurred, reasoning "had the case proceeded to trial,
the jury would have been forced to speculate as to the cause of
the accident"); <u>Ithaca Mem. Ch. No. 147, Disabled Amer. Veterans
v. First Nat. Bank & Trust Co.</u>, 96 A.D.2d 667, 667, 466 N.Y.S.2d
496, 497 (3d Dep't 1983) ("without proof that an act of defendant

was a proximate cause of the fire, there can be no recovery").

   Thus, Duane Reade has made a sufficient showing that
plaintiff lacks evidence that Duane Reade was negligent and
plaintiff has failed to come forward with evidence raising a
triable issue of material fact otherwise.  Drawing all reasonable
inferences in plaintiff's favor, there are no genuine issues of
material fact that preclude granting summary judgment in Duane
Reade's favor.  Therefore, Duane Reade's motion for summary
judgment is granted.  See Hinkle v. United States of America, No.
98-CV-0082, 1999 WL 239701, at *1 (S.D.N.Y. Apr. 23, 1999)
(quoting Celotex, 477 U.S. at 322-23) ("[T]he plain language of
Rule 56(c) mandates the entry of summary judgment, after adequate
time for discovery and upon motion, against a party who fails to
make a showing sufficient to establish the existence of an
element essential to that party's case, and on which that party
will bear the burden of proof at trial.").

## Conclusion

For the foregoing reasons, defendant Duane Reade's motion for summary judgment is granted and the complaint against Duane Reade is dismissed.

Dated:      Brooklyn, New York
            August 2, 2007

                                SO ORDERED:


                                _____/s/_____
                                David G. Trager
                                United States District Judge